## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

VANESSA TUCKER,
*Individually and on behalf of those similarly situated*;

                Plaintiff,

                              **NO.:**

vs.

HARCROS CHEMICALS INC.;
PHILIPS ELECTRONICS NORTH AMERICA
CORPORATION;
KONINKLIJKE PHILIPS N.V.;
ELEMENTIS CHEMICALS, INC.;
ELEMENTIS PLC;
and ABC CORPORATIONS (1-5).

                Defendants.

                            **JURY TRIAL REQUESTED**

                          **Complaint — Class Action**

## F.R.C.P. 23(b) CLASS ACTION COMPLAINT FOR
## THE FOLLOWING CAUSE OF ACTION

## COUNT I:
### Equitable Relief—Establishment of Court Supervised Medical Monitoring Fund

COMES NOW, the Plaintiff, Vanessa Tucker, individually ("Named Plaintiff"), and on behalf of those similarly situated (collectively the "Class"), by and through their undersigned counsel, and state as follows for this complaint against the above-captioned Defendants:

## NATURE OF THE ACTION

1. Plaintiff brings this class action for injunctive and equitable relief, seeking the establishment of a court-supervised medical monitoring program for current and former community members with significant exposure to toxins emitted from the Harcros Chemicals, Inc. facility located at 5200 Speaker Road, Kansas City, Wyandotte County, Kansas ("the Facility" or "Harcros Facility").

2. For more than sixty years, Defendants and their corporate predecessors have operated the Harcros Facility, releasing into the surrounding environment a dangerous mixture of more than thirty chemicals listed under the EPA's Toxics Release Inventory (TRI).

3. These emissions include various likely and known human carcinogens, in particular: Ethylene Oxide ("EtO"), as well as Cumene, Formaldehyde, Tetrachloroethylene ("PERC"), Epichlorohydrin, Ethyl Benzene, Nonylphenol, Propylene Oxide, and Vanadium (collectively referred to as "EtO and other toxic chemicals").[1]

---

[1] Full list of 33 TRI-Listed chemicals known to have been released since 1987 is incorporated herein, and available at https://enviro.epa.gov/facts/tri/ef-facilities/#/Chemical/66106HRCRS5200S

4. Scientific modeling by the EPA's Risk-Screening Environmental Indicators (RSEI) system places the Harcros Facility among the top emitters nationwide for cumulative human health risk.

5. Research conducted by The Ohio State University reveals that residents within the exposure plume suffer an average lifespan reduction of up to twenty (20) years compared to residents in non-exposed communities within the same county.

6. Plaintiff petitions the Court for equitable relief requiring Defendants to fund and implement a medical monitoring program to enable early detection of latent disease and prevent unjustified and readily avoidable deaths for themselves and class members.

7. Under LR 40.2(a), Plaintiff requests that this matter be tried in Kansas City, Kansas, and unless the Court orders otherwise, the Plaintiff herein requests, under the local rules, that the case be filed, docketed, and maintained in Kansas City, Kansas.

## GENERAL BACKGROUND

8. For over 60 years, Defendants have knowingly emitted dangerous quantities of neurotoxins, endocrine disruptors, DNA-mutagens, and human carcinogens into the air of Kansas City, Kansas, poisoning the thousands of innocent men, women, and children in the community surrounding the Facility.

9. These dangerous emissions are continuous, ongoing, and periodically include sudden or accidental discharges.

10. Unjustified exposure to these emissions occurred despite the foreseeable risks to human health and safety. It has caused significant harm to the affected individuals, who have unavoidably

inhaled dangerously high levels of this toxic cocktail of chemicals, many of whom have been exposed to it for their entire lives.

11. Take EtO exposure for example: over a lifetime, an annual average of just .0002 micrograms per cubic meter of air, or .0001 parts per billion (ppb) is associated with a one-in-a-million risk of getting cancer, according to EPA's 2016 IRIS Evaluation of the Inhalation Carcinogenicity of Ethylene Oxide.[2] That risk is thought to be doubled or even higher when exposure occurs before the age of 16.

12. Of urgent concern, the following K–12 schools fall well within the toxic plume, placing over five thousand students at ongoing risk from daily exposure to hazardous air contaminants at these and other area schools:

- Turner Elementary School (570)[3]
- Turner Middle School (571)[4]
- Turner High School (1,134)[5]
- Turner Sixth Grade Academy (280)[6]

---

[2] https://cfpub.epa.gov/ncea/iris/iris_documents/documents/subst/1025_summary.pdf#nameddest=rfc, at 5
[3] *National Center for Education Statistics*,
https://nces.ed.gov/ccd/schoolsearch/school_detail.asp?Search=1&DistrictID=2012360&ID=201236000022
(Accessed: 16 June 2025).
[4] *National Center for Education Statistics*,
https://nces.ed.gov/ccd/schoolsearch/school_detail.asp?ID=201236001520 (Accessed: 16 June 2025).
[5] *National Center for Education Statistics*,
https://nces.ed.gov/ccd/schoolsearch/school_detail.asp?Search=1&DistrictID=2012360&ID=201236000024
(Accessed: 16 June 2025).
[6] *National Center for Education Statistics*,
https://nces.ed.gov/ccd/schoolsearch/school_detail.asp?Search=1&DistrictID=2012360&ID=201236001859
(Accessed: 16 June 2025).

- Lindbergh Elementary School (178)[7]
- Emerson Elementary School (180)[8]
- New Stanley Elementary School (224)[9]
- El Centro Academy for Children (total enrollment not available)[10]
- Frances Willard Elementary School (400)[11]
- Eugene Ware Elementary School (244)[12]
- Wyandotte High School (1,841)[13]
- = _5,737 total students within the plume in the 2023-2024 school year_

13. Multiple generations attending these schools have been unjustly and unknowingly inhaling harmful amounts of human carcinogens, neurotoxins, and DNA mutagens—substances particularly dangerous to children.

---

[7] _National Center for Education Statistics_,
https://nces.ed.gov/ccd/schoolsearch/school_detail.asp?Search=1&SchoolID=200795001430&ID=200795001430
(Accessed: 16 June 2025).
[8] _National Center for Education Statistics_,
https://nces.ed.gov/ccd/schoolsearch/school_detail.asp?Search=1&SchoolID=200795001395&ID=200795001395
(Accessed: 16 June 2025).
[9] _National Center for Education Statistics_,
https://nces.ed.gov/ccd/schoolsearch/school_detail.asp?Search=1&SchoolID=200795001409&ID=200795001409
(Accessed: 16 June 2025).
[10] Childcare Center, https://childcarecenter.us/provider_detail/el_centro_academy_for_children_kansas_city_ks
(Accessed: 16 June 2025).
[11] _National Center for Education Statistics_,
https://nces.ed.gov/ccd/schoolsearch/school_detail.asp?Search=1&SchoolID=200795001413&ID=200795001413
(Accessed: 16 June 2025).
[12] _National Center for Education Statistics_,
https://nces.ed.gov/ccd/schoolsearch/school_detail.asp?Search=1&SchoolID=200795001410&ID=200795001410
(Accessed: 16 June 2025).
[13] _National Center for Education Statistics_,
https://nces.ed.gov/ccd/schoolsearch/school_detail.asp?Search=1&SchoolID=200795001420&ID=200795001420
(Accessed: 16 June 2025).

14. This site is not just a relic of past pollution; it remains an active and alarming hazard. The facility's EPA Risk Screening Environmental Indicators (RSEI) score indicates its obscene hazard level.[14] In 2021, the national median score for any facility was 14 points. In Kansas, it was 10. In Wyandotte County, it was a staggering 320 points. For the specific high-risk facility type Harcros is designated as "Surface Active Agent Manufacturing," the median score was far higher, at 2,369. This facility's risk score in 2021 was 6,470,152. That exceeds the collective score—and thus risk posed—of 2,700 separate median-risk facilities of the same hazardous industry-type designation.

15. This action, and the related action being contemporaneously filed,[15] seeks to prevent further generations of needless deaths in the impacted Kansas City community. Aggregate litigation—specifically through the class action—is the superior method of administering justice towards a reasonable resolution in this case.

## PARTIES

### I.   NAMED PLAINTIFF/CLASS REPRESENTATIVE

16. Vanessa Tucker was born in 1977 and has spent most of her life in Kansas City, Kansas.

17. Vanessa lived on 62nd Terrace, just over 1.5 miles from the facility, from 1977 to 2006.

---

[14] https://enviro.epa.gov/envirofacts/tri/rsei?facid=66106HRCRS5200S

[15] The related action being contemporaneously filed seeks compensatory and punitive damages for a class with various diagnosed chronic injuries. *See Jefferies, et al. v. Harcros Chemicals, Inc., et al*, No. 2:25-cv-02352. These are filed as Related Matters and the Plaintiff intends to consolidate this matter under FRCP 42 with that case for pre-trial coordination for the purposes of efficiency and judicial economy.

18. Vanessa has spent most of her life within and in the immediate vicinity of the Harcros facility's toxic plume.

19. Vanessa's mother spent time within the plume while pregnant with Vanessa—unaware of the air toxins she was inhaling and exposing her unborn child to.

20. Vanessa has not developed one of the chronic conditions captured in the sister-class suit—for which she is thankful. Her prolonged exposure makes a fair steward of the impacted residents and former residents of this plume area, with an increased health risk profile that is typical of the Class.

21. Due to the actions of Defendants exposing her to various carcinogens and other toxins, Vanessa and the Class have suffered a legal detriment arising from the exposure itself and the concomitant need for medical testing. The remedy requested in this action is just and fair to remedy the legal detriments suffered by Vanessa and the Class.

## II.    HARCROS-GROUP DEFENDANTS

22. Defendant **Harcros Chemicals Inc. ("Harcros")** is a domestic for-profit corporation organized and existing under the laws of the State of Kansas, with its principal place of business located at 5200 Speaker Road, Kansas City, Kansas 66106. Harcros Chemicals Inc. is registered with the Kansas Secretary of State and is in active and good standing. Its registered agent for service of process is C T Corporation System, with a registered office address at 112 SW 7th Street, Suite 3C, Topeka, Kansas 66603.

23. Harcros is the latest in a series of corporate successors to own and operate the Facility.

24. Harcros has formerly done business as: HCI Acquisitions Inc., Thompson-Hayward Chemicals Company ("THCC"), and Thompson-Munro-Robins Chemical Co.

25. Harcros began business in 1917 as Thompson, Munro and Robins, and changed its name to THCC in 1923. North American Philips acquired THCC in 1961. In 1981, the company again changed hands when Harrisons and Crosfield plc (now Elementis Chemicals, Inc.) purchased the bulk of the business from North American Philips.

26. The company's name was changed to Harcros Chemicals, Inc. in 1988. In 2001, a management buyout resulted in the privatization of Harcros. It remains a privately held corporation today.

27. Recent environmental enforcement actions against Harcros include:

    a.   In 2016, Harcros was fined ~$1,000,000.00 for Clean Air Act violation(s) in Atchison, Kansas. Harcros pled guilty to negligently combining nearly 10,000 gallons of highly reactive chemicals—causing a greenish-yellow chlorine gas cloud to form that caused evacuation and shelter in place orders, creating a public health crisis which sent nearly 150 people to seek medical attention;[16]

    b.   On May 29, 2012, the U.S. Environmental Protection Agency (EPA) entered into an Administrative Order on Consent with Harcros, T H Agriculture and Nutrition Company, Inc. (THAN), which had been a subsidiary of North American Philips Corporation, and Elementis Chemicals Inc. for cleanup work at the Harcros Chemicals

---

[16] https://www.justice.gov/usao-ks/pr/harcros-chemicals-pleads-guilty-violating-clean-air-act

Inc. site in Davenport, Iowa—where the cleanup work is expected to address over 1.2

million cubic yards of groundwater contamination.[17]

28. Harcros has paid over eight million dollars in environmental penalties since 2000.[18]

29. This is a long-standing pattern for Harcros and its legacy entities. For example, a Fresno,

California Thompson-Hayward Chemical Company site was put on the National Priorities List

as of 1988. The five-acre site was the former location of an agricultural chemical formulation,

packaging, and warehousing plant that operated from 1942 until 1981.

30. As recently as September 2019, Harcros was issued what appears to be its latest penalty by the

EPA for the Facility under RCRA after entering a consent decree with a penalty of $139,745

and a compliance cost of $167,000. [19]

---

[17]https://www.epa.gov/enforcement/case-summary-settlement-groundwater-contamination-cleanup-harcros-chemicals-site-iowa#:~:text=and/or%20adsorption.-,Information%20about%20the%20Administrative%20Order%20on%20Consent,as%20a%20drinking%20water%20source.&text=c)%20institutional%20controls.,measures%20to%20address%20contaminated%20groundwater.

[18]https://violationtracker.goodjobsfirst.org/parent/harcros-chemicals#:~:text=Current%20Parent%20Company%20Name:%20Harcros,separate%20announcements%20of%20the%20outcome.

[19] Attached as Exhibit A is the Consent Agreement and Final Order, Doc. No. RCRA-07-2019-0251.

31. EPA alleged Harcros' improper handling, use, storage, and disposal of the highly toxic and likely carcinogenic substance vanadium pentoxide.[20]Among other allegations of egregious wrongdoing, the EPA stated that:

> 37.    Surfaces contaminated with discarded vanadium pentoxide hazardous waste (P120) that could not be cleaned by sweeping were hosed with water. Washdown water from the production area either flowed into the surface trench or into a drain within the diked area where the mixing tank is located (Tank Dike 1), and then flowed into the waste water system and to an equalization tank (EQ Tank), before it was discharged to the Wyandotte County, Kansas wastewater treatment facility.

## III.    PHILIPS-GROUP DEFENDANTS

32. Defendant **Philips Electronics North America Corporation ("PNA")** f/d/b/a North American Philips is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in the United States. Philips Electronics North America Corporation is registered with the Delaware Secretary of State and remains in active status. Its registered agent for service of process is The Corporation Trust Company, with a registered office address at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

---

[20] Natural sources of vanadium, as well as man-made sources such as ore-processing dust, tend to release large particles that are more likely to settle near the source. Smaller particles, such as those emitted from oil-fueled power plants, have a longer residence time in the atmosphere and are more likely to be transported farther away from the site of release (Zoller et al. 1973). Vanadium transported within the atmosphere is eventually transferred to soil and water on the earth's surface by wet and dry deposition and dissolution in sea water (Duce and Hoffman 1976; Van Zinderen Bakker and Jaworski 1980). . . . The average residence time for vanadium in the atmosphere is unknown as the particle size varies considerably.  An estimated residence time of about 1 day has been proposed for the settling of fly ash vanadium pentoxide when associated with hydrogen sulfate (EPA 1985a).
See ATSDR ToxProfile, Vanadium.

33. PNA controlled, owned, and operated the Facility from 1961-1981.

34. Defendant **Koninklijke Philips N.V. ("KP")** is a public limited liability company organized under the laws of the Netherlands with a principal place of business at High Tech Campus 52 NL-5656 AG Eindhoven, Netherlands.

35. KP has previously operated as Firma Philips & Co (1891–1912), N.V. Philips' Gloeilampenfabrieken (1912–1994), Philips Electronics N.V. (1994–1998), and Koninklijke Philips Electronics N.V. (1998–2013).

36. KP was started by Fredrick Philips and his son Gerard Philips, in 1891, and benefited from the tremendous wealth accumulated by their father/grandfather Lion Philips—a Dutch tobacco trade tycoon in the early and mid-1800s, who capitalized off of the market conditions fueled by the tobacco plantation system in the American South.

37. PNA is a wholly owned and controlled subsidiary of Defendant KP.

38. The Philips Defendants or their predecessors sought to discharge claims in bankruptcy without providing constitutionally required notice to Plaintiff, as discussed later in Section VI.

39. At the time of such bankruptcy filings, Plaintiff was known or reasonably ascertainable creditors because they lived in the impacted area.

40. Defendants had the ability to locate Plaintiff's address through land records and other public means, and notice by publication alone was constitutionally inadequate. *See In re Motors Liquidation Co.*, 829 F.3d 135, 159 (2d Cir. 2016).

41. In the alternative, Defendants should have posted notice in the impacted community to alert potential creditors, and their failure to do so deprived Plaintiff and the Class of due process.

42. According to the Kansas Department of Health and Environment ("KDHE"), the Facility became operational in December 1960 and was sold to Philips in 1961. At that time, operations included wholesale distribution of industrial chemicals and supplies, and production of phenoxy herbicides, primarily 2,4-dichlorophenoxyacetic acid (2,4-D).[21] 2,4-D was determined to be a "possible human carcinogen" by IARC[22] in 2016 due to a mixture of strong mechanistic information but insufficient epidemiological data, primarily because 2,4-D as a pesticide is/was commonly mixed with other pesticides, making contribution science difficult.[23]

43. In 1963, a process building was constructed at the Facility to manufacture 2,4,5-trichlorophenoxyacetic acid (2,4,5-T). 2,4,5-T was banned in 1985, and was known to contain high levels of dioxin, a contaminant, found to cause cancer and other health problems in people.[24] On information and belief, dangerous quantities of dioxin were emitted into the air from the Facility during this production period.

---

[21] Retrieved from https://keap.kdhe.ks.gov/ber_isl/ISL_Pub_Detail.aspx?ProjectCode=C410571091 (last accessed April 7, 2025).

[22] The International Agency for Research on Cancer (IARC) is the world's leading authority on the classification of carcinogens. This Agency operates as a specialized agency of the World Health Organization (WHO), focusing largely upon identifying and classifying carcinogenic substances and their impacts. The IARC analyzes and evaluates the strength of evidence from oral, inhalation, oral or dermal exposure, from studies of cancer in humans and experimental animals, and mechanistic or any other relevant data, for or against carcinogenicity of a particular agent.  These evaluations are based solely on identification of cancer hazard, not potential risk

[23] See https://www.iarc.who.int/wp-content/uploads/2018/07/pr236_E.pdf (last accessed April 7, 2025).

[24] See https://www.epa.gov/ingredients-used-pesticide-products/24-d (Last accessed April 7, 2025).

44. In 1965, an ethoxylation plant was built at the Facility, and surfactant agents such as industrial emulsifiers, wetting agents, and antifoam agents were manufactured.[25]

45. Ethoxylation is a chemical manufacturing process in which ethylene oxide reacts with a compound, like an alcohol or acid, to create products known as ethoxylates. These are often used as surfactants.

46. Therefore, EtO use and emissions from the facility started no later than 1965, which is when the Facility was under the Philips-Group Defendants' ownership and control.

47. In about 1967, the facility began to produce 2-(2,4,5-trichlorophenoxy) propionic acid (Silvex). The EPA banned Silvex for most uses in 1979 and altogether in the US in 1985, due to its unreasonable dangers as a toxin.[26] All these concerning developments occurred during Philips' ownership and control, and before the EPA or KDHE were established in the early/mid-seventies.

## IV.    ELEMENTIS-GROUP DEFENDANTS

48. Defendant **Elementis Chemicals, Inc. ("ECI")** is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in the United States. Elementis Chemicals Inc. is registered with the Delaware Secretary of State. Its registered agent for service of process is: The Corporation Trust Company, with a registered office address at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

---

[25] https://keap.kdhe.ks.gov/ber_isl/ISL_Pub_Detail.aspx?ProjectCode=C410571091 (last accessed April 7, 2025)
[26] Retrieved from https://oehha.ca.gov/water/chemicals/silvex (Last accessed April 7, 2025).

49. ECI controlled, owned and operated the Facility from 1981-2001.

50. Defendant **Elementis PLC** is a public limited company organized and existing under the laws of the United Kingdom, with its registered office located at The Bindery, 5th Floor, 51-53 Hatton Garden, London, United Kingdom, EC1N 8HN.

51. As per the 2023 Annual Report of Elementis PLC, ECI is a wholly owned subsidiary of Defendant Elementis PLC.[27]

52. Elementis PLC's legacy entity was founded in 1844 as Harrisons & Crosfield, initially engaged in the tea trade. Over the next 150 years, it evolved into a significant player in Southeast Asia's plantation industry, profiting from the monopolized colonial control and exploitation of local labor. As decolonization progressed, the company gradually divested its plantation interests and refocused its business on other industries. It diversified into chemicals, timber, construction materials, and animal feed before eventually concentrating solely on chemicals and rebranding as Elementis.

53. Throughout its history, Elementis' growth has been deeply intertwined with the exploitation of the land and labor emblematic of colonialization.

## V.    ADDITIONAL-DEFENDANTS GROUP

---

[27] Koninklijke Philips N.V., *2023 Annual Report*, https://www.results.philips.com/publications/ar23?type=annual-report (last visited Mar. 4, 2025).

54. Defendants **ABC CORPORATIONS (1-5)** are currently unknown corporations or entities that owned, operated, managed, or otherwise participated in the Facility's control and are liable for the tortious conduct, injuries, and damages alleged herein.

55. ABC CORPORATIONS (1-5) are legally responsible for the wrongful acts alleged herein, either through their own conduct, vicariously/indirectly, or both. Additional corporate entities, including their successors and assigns, whether presently known or unknown, may also be held liable under these theories. Plaintiff reserves the right to amend the pleadings to add additional defendants as discovery progresses and the identities of all relevant and responsible parties become known. Accordingly, Plaintiff has named ABC Corporations 1-5 as placeholders for such potential additions.

## VI.    REPEAT PLAYERS, REPEAT PROBLEMS:
## LESSONS FROM THE *ATKINS* AND *ELEMENTIS* CASES

56. This isn't the first time these companies have faced credible community-contamination claims as defendants in aggregate litigation.

57. In *Atkins v. Harcros Chemicals, Inc.*, No. 89 C 19234 (Civ. Dist. Ct., Orleans Parish, La. 1993), residents of New Orleans' Gert Town neighborhood sued as a class over toxic releases from a facility owned by the Thompson Hayward/Harcros/Philips corporate family. That matter proceeded through contested litigation and was resolved by substantial settlement funding from, among others, current Harcros (then owned by Elementis) and Philips entities.[28]

---

[28] *See attached*, Chapter on *Atkins* case, Exhibit B.

58. *Atkins* demonstrates that these Defendants have an established history of defending community-wide exposure class action claims related to chemical manufacturing operations in a dense residential area as overlapping and successor entities.

59. These same defendants have also sued one another for contribution in environmental contamination cases. *See Elementis Chemicals Inc. v. T H Agriculture & Nutrition, L.L.C.*, 373 F. Supp. 2d 257, 260–64 (S.D.N.Y. 2005) (Sand, J.) (detailing the 1981 Asset Purchase Agreement among Harrisons & Crosfield, Ltd. (the Elementis predecessor), North American Philips Corp. (later Philips Electronics North America Corporation, "PENAC"), and Thompson Hayward; subsequent name changes of Thompson Hayward → Harcros; and identifying the Facilities).

60. The *Elementis* opinion identifies and describes site-specific allocation agreements that include the Kansas City facility.

61. The court further recited that Elementis PLC is "the ultimate corporate parent of … ECI," tracing the ownership chain (Elementis America Inc. → Elementis Holdings Ltd. → Elementis Group BV → Elementis PLC). *Id.* at 261–62.

62. These international corporate-parent relationships are not new allegations and have been confirmed in prior federal litigation.

63. Plaintiff further alleges, based on the S.D.N.Y.'s findings in *Elementis*, that:

(a) Elementis PLC is the ultimate parent in the Elementis group that owned and controlled entities in the chain associated with Harcros/Elementis operations at 5200 Speaker Road;

(b) Elementis Chemicals, Inc. ("ECI") is the successor to Harcros with direct historical ties to the Speaker Road facility and participated in Kansas City–specific allocation agreements;

(c) Philips Electronics North America Corporation ("PENAC/Philips") is the North American successor to NAP, was a signatory/counterparty to multiple interim and final allocation agreements, and brought third-party claims in *Elementis*; and

(d) T H Agriculture & Nutrition, L.L.C. ("THAN") is a successor in the Thompson Hayward line and a counterparty in those same agreements. *See id.* at 260–62.

64. The *Elementis* matter shows these entities pressing and resisting CERCLA and contract-based contribution claims. *Id.* at 260–62.

65. Any suggestion by Elementis or Philips parent companies that they are too remote from the Kansas City controversy is contradicted by the existence of the Kansas City Final Allocation Agreement and the prior-referenced state and federal cases that demonstrate notice, involvement, and coordinated responsibility tied to this site.

66. Having (i) executed Kansas City–specific allocation agreements, (ii) litigated contribution and indemnity among themselves in *Elementis*, and (iii) funded resolution of prior community exposure litigation (*Atkins*), these Defendants should not be heard to lodge claims of disconnect from the operations and liabilities pleaded here.

67. Equity disfavors that stance: unclean hands principles are implicated when parties first acknowledge shared responsibility in intercorporate litigation and then seek to disclaim it when a harmed community seeks relief.

68. Discovery will supply the precise figures on the ultimate community cost of this entry on the growing list of similar cases against these exact defendants.

69. *Atkins* and *Elementis* are referenced at the pleading stage to: (a) establish notice, knowledge, and corporate continuity; (b) place before the Court the existence of Kansas City–specific

allocation agreements and prior litigation regarding this and related sites; and (c) preempt any suggestion that these claims are unprecedented or that these Defendants are or were too remote from the Kansas City operations for jurisdiction or otherwise.

70. The Bankruptcy filings for THAN further demonstrate the links between defendants.[29]

71. In a sworn disclosure statement filed in federal bankruptcy court, THAN admitted that Philips and Elementis exercised ownership, indemnity, and successor obligations arising from THAN's chemical distribution operations, including hazardous materials facilities such as the Kansas City site.

72. In that disclosure, THAN itself identified that asbestos-related claims against it also extended by operation of law to Philips, Elementis, and other corporate affiliates under theories of veil piercing, alter ego, successor liability, fraudulent conveyance, and conspiracy. These admissions by Defendants' own corporate family defeat any claim that the present environmental liabilities were unforeseeable or insulated from their corporate responsibility.

73. THAN further disclosed that at least thirty-three of its former branch locations carried environmental liabilities requiring investigation and remediation, including sites placed on the National Priorities List under the federal Superfund program. This acknowledgment demonstrates a long-standing and well-documented pattern of environmental contamination across THAN's former chemical facilities.

---

[29]See Generally, http://bankrupt.com/misc/THAGRICULTURE_Disclosure_Statement.pdf

74. Defendants' Kansas City facility is not an isolated incident, but rather part of a broader course of corporate conduct in which hazardous emissions were repeatedly externalized onto surrounding communities.

75. The Court should draw the reasonable inference that all hearin-named defendants are properly joined; that they have long recognized, allocated, and litigated environmental responsibilities associated with the Kansas City facility and related operations; and that equity counsels against allowing dilatory arguments to derail adjudication on the merits.

## VENUE AND JURISDICTION

76. This Court has jurisdiction over this action, which calls upon the Court's equitable powers to provide for non-damages-based injunctive relief.

77. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because (i) at least one member of the Class is a citizen of a different state than Defendants, (ii) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (iii) none of the exceptions under that subsection apply to this action

78. This Court has personal jurisdiction over Defendants because they operate or previously operated an industrial facility physically located within this District, currently conduct or previously conducted business throughout this District, and committed tortious acts within this District that are the subject of this suit.

79. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims of Plaintiff and the Class occurred in this District.

**ARTICLE III STANDING**

80. Plaintiff and class members have Article III standing because they have suffered a concrete and particularized injury: wrongful exposure to Defendants' toxic emissions creating a present, unjustified increased risk of latent disease that necessitates immediate and ongoing medical intervention.

81. The Fourth Circuit recently confirmed that this exposure-plus-monitoring injury is constitutionally cognizable under Article III. *See Sommerville v. Union Carbide Corp.*, No. 24-1491, slip op. at 12–16 (4th Cir. Aug. 18, 2025) (holding that a plaintiff alleging tortious exposure to EtO and a present medical need for monitoring has suffered an "actual and concrete" injury sufficient for constitutional standing). Slip Opinion attached as Exhibit C.

82. *Sommerville* explains that, under established medical-monitoring principles, "the exposure itself and the concomitant need for medical testing constitute the injury," and it distinguishes this present injury from a mere fear of future harm. *Id.* at 4, 15–16.

83. Consistent with this authority, Plaintiff seeks narrowly tailored equitable relief directly addressed to that injury: a court-supervised medical monitoring program to fund and administer the diagnostic testing necessary to mitigate the increased risk created by Defendants' past and ongoing toxic emissions.

**PRIMARY TOXIN OF CONCERN: ETHYLENE OXIDE (EtO)**

84. The man-made chemical compound EtO was first discovered in 1859 by a French chemist, Charles-Adolphe Wurtz, while studying the reaction between ethylene and chlorine.

85. While trace amounts of EtO are found in nature, its industrial chemical manufacturing is necessary for the volume used in various industries.

86. Most EtO produced in the United States is used as an intermediate in producing other industrial chemicals.

87. The EtO emitted from the Facility remains in the air for months, becomes concentrated in atmospheric inversions, and moves through neighboring communities through prevailing winds. Ethylene oxide can last in the air for weeks and can be transported with prevailing winds. Neither rain nor absorption into aqueous aerosols effectively removes ethylene oxide from the atmosphere.

88. Its estimated average half-life in the atmosphere is 69 days (during summer months) to 149 days (during winter months). The half-life of EtO in the atmosphere has been reported to be as long as 211 days.

89. Accordingly, EtO remains in the air that Plaintiff and class members breathe long after it has been emitted from the Facility and continuously—inescapable for those living within the plume.

90. Once inhaled, EtO is rapidly distributed throughout the body and readily taken up by the lungs. At steady state, 20-25% of inhaled ethylene oxide reaching the alveolar space is exhaled as an unchanged compound, and 75-80% is metabolized by the body.

91. EtO is highly flammable and explosive in its room-temperature gaseous form, therefore, it is typically handled and shipped as a refrigerated liquid to mitigate those risks.

92. EtO is so explosive that it is one of the main components in thermobaric and "fuel-air explosive" weapons used by the US military, sometimes called "vacuum bombs." These bombs

often produce an atomic-mushroom-like smoke signature and blast characteristics that look like "mini-nukes." They are among the most powerful non-nuclear weapons in our country's arsenal. EtO is a preferred compound for such military uses because it has a shock wave effectiveness of 5:1 compared to dynamite.[30]

93. Beyond its accumulative and explosive traits, the DNA-damaging properties of ethylene oxide exposure have been studied continuously since the 1940s.

94. In a 1977 report, the National Institute for Occupational Safety and Health ("NIOSH") concluded that occupational exposure to EtO may increase the frequency of mutations in human populations. NIOSH recommended that EtO be considered mutagenic and potentially carcinogenic to humans.

95. In 1981, NIOSH released a new bulletin focusing on new evidence of carcinogenic, mutagenic, and reproductive hazards associated with EtO. It also reiterated that EtO was a potential occupational carcinogen and reported that no safe levels of EtO exposure had been demonstrated.

_____

[30] Meyer R, Köhler, J., Homberg A. *Explosives. 6th ed*. Weinheim, Germany: Pg. 142. *See also, Denney v. United States*, 185 F.2d 108, 110 (10th Cir. 1950) ("when highly explosive and inherently dangerous substances are kept or used in thickly populated areas or in proximity to homes and buildings, so as to make danger extreme and injury probable, the courts have held possession or use a nuisance per se, and imposed strict liability for damages or injuries resulting therefrom.")

96. EtO has been on the EPA's TRI toxic chemical list since the list's inception in 1987. 40 C.F.R. § 372.65.

97. EtO was first listed in the Fourth Annual Report on Carcinogens in 1985 as reasonably anticipated to be a human carcinogen. That listing was revised to be a known human carcinogen in the Ninth Report on Carcinogens in 2000 and has remained since.

98. IARC has conducted consecutive evaluations of the carcinogenicity of EtO to humans for decades.

99. The classification for EtO was upgraded to "carcinogenic to humans (Group 1)" in 1994.[31] This is the highest/most supported classification of a chemical as a carcinogen available to the world's most trusted source of cancer research.

100. The upgraded classification was confirmed by IARC Working Groups in 2008[32] and 2012[33].

101. In 2016, the EPA's Integrated Risk Information System (IRIS) increased the previously set cancer potency of EtO by 30 times, and 60 times for children.[34]

---

[31] International Agency for Research on Cancer. IARC monographs on the evaluation of carcinogenic risks to humans, volume 60. Some industrial chemicals. Lyon, France: IARC; 1994. Available from: https://publications.iarc.fr/78

[32] International Agency for Research on Cancer. IARC monographs on the evaluation of carcinogenic risks to humans, volume 97. 1,3-Butadiene, ethylene oxide and vinyl halides (vinyl fluoride, vinyl chloride and vinyl bromide). Lyon, France: IARC; 2008. Available from: https://publications.iarc.fr/Book-And-Report-Series/Iarc-Monographs-On-The-Identification-Of-Carcinogenic-Hazards-To-Humans/1-3-Butadiene-Ethylene-Oxide-And-Vinyl-Halides-Vinyl-Fluoride-Vinyl-Chloride-And-Vinyl-Bromide--2008

[33] International Agency for Research on Cancer. IARC monographs on the evaluation of carcinogenic risks to humans, volume 100F. A review of human carcinogens. Chemical agents and related occupations. Lyon, France: IARC; 2012. Available from: https://publications.iarc.fr/Book-And-Report-Series/Iarc-Monographs-On-The-Identification-Of-Carcinogenic-Hazards-To-Humans/Chemical-Agents-And-Related-Occupations-2012

[34] https://iris.epa.gov/static/pdfs/1025tr.pdf

102. The Federal Occupational Safety and Health Administration ("OSHA") classifies EtO as "Highly Hazardous Chemicals, Toxics and Reactives."

103. Exposure to EtO has been widely studied and its adverse health effects are well documented. Presently, there is evidence linking EtO exposure to increased risk of lymphatic and hematopoietic cancer such as lymphomas, myelomas, and leukemia; breast cancer; tumors in the lungs, uterus, and the brain; cancers in connective tissues and bones; and reproductive and developmental impairments including increased rates of miscarriage and infertility.

104. Chronic inhalation exposure to EtO has been linked to adverse reproductive health effects. Epidemiological studies have explored potential associations between EtO exposure and spontaneous abortion. For example, a study of 1,443 sterilizer workers in Finland found that workers exposed to EtO during pregnancy had over 3x higher rate of spontaneous abortion (15.1%) compared to those not exposed (4.6%). Similarly, other studies reported elevated risks of spontaneous abortion, preterm birth, and post-term birth among female dental assistants and sterilizer workers who were exposed to the chemical.[35]

105. In addition to human studies, experimental animal research supports the potential reproductive toxicity of EtO. Furthermore, male reproductive toxicity, including reduced sperm

---

[35] Agency for Toxic Substances and Disease Registry (ATSDR), Toxicological Profile for Ethylene Oxide (Aug. 2022), at 48–50, https://www.atsdr.cdc.gov/toxprofiles/tp137.pdf.

count and testicular damage, has been observed following exposure to EtO vapor in rats and monkeys.[36]

106. The EPA has concluded that EtO is carcinogenic to humans by inhalation exposure. The stated confidence in this classification is "HIGH."[37]

107. In addition to the increased cancer potency estimate, the 2016 IRIS assessment also included an adjustment for early life sensitivity to EtO. The EPA estimated that individuals exposed to EtO during early life (e.g., children) may experience higher cancer risks than adults.[38]

108. In identifying EtO as carcinogenic to humans (Group 1), the IARC Working Group (2012) also relied on mechanistic data.

109. The United States National Toxicology Program (National Toxicology Program 2014) and the EPA emphasize the importance of data on mechanistic pathways (by which agents may act as carcinogens) in cancer risk assessments (EPA 2005) (Krewski et al., 2019). [39]

---

[36] *Id.*

[37] Cite

[38] U.S. ENVTL. PROT. AGENCY, INTEGRATED RISK INFORMATION SYSTEM (IRIS) ASSESSMENT OF ETHYLENE OXIDE (2016),

https://cfpub.epa.gov/ncea/iris_drafts/recordisplay.cfm?deid=329730 (last visited Mar. 4, 2025)

[39] Krewski D, Bird M, Al-Zoughool M, Birkett N, Billard M, Milton B, Rice JM, Grosse Y, Cogliano VJ, Hill MA, Baan RA, Little J, Zielinski JM. Key characteristics of 86 agents known to cause cancer in humans. J Toxicol Environ Health B Crit Rev. 2019;22(7-8):244-263.

110. Electrophilic[40] properties and genotoxicity[41] are considered the most significant characteristics of a carcinogen (Smith et al., 2016).

111. There is strong evidence that EtO, a direct-acting alkylating agent, exerts its carcinogenic effects by a genotoxic mechanism. A dose-related increase in the frequency of ethylene oxide-derived hemoglobin adducts was demonstrated in exposed humans and rodents, and a dose-related increase in the frequency of ethylene oxide-derived DNA adducts was seen in exposed rodents. EtO acted as a mutagen and clastogen at all phylogenetic levels; it induced heritable translocations in germ cells of rodents, a dose-related increase in sister chromatid exchanges, chromosomal aberrations and micronucleus formation in lymphocytes of exposed workers.

112. A recent IARC Monographs Programme analysis examined mechanistic data from the IARC Monographs for 86 Group 1 human carcinogens, identifying genotoxicity as the most common mechanistic characteristic of EtO

---

[40] Electrophilic (electron-seeking) properties of a chemical is the most significant characteristic of carcinogen. Electrophilic molecules are commonly form addition products, generally referred to as adducts, with DNA, RNA and proteins. Some chemical carcinogens belong to the direct-acting electrophiles (e.g., ethylene oxide, formaldehyde, sulfur mustard), whereas others (e.g. polycyclic aromatic hydrocarbons and benzene) require metabolic activation / biotransformation by enzymes to ultimate carcinogenic and reactive forms (Miller, 1970).

[41] The term "genotoxic" refers to an ability of agent to induce DNA damage in the form of DNA adducts, single- or double-strand breaks, oxidized or fragmented nucleotide bases, covalent binding to the bases. The DNA damage generally does not alter the linear sequence of nucleotides (or bases) in the DNA. Gene mutation is defined as a change in the normal nucleotide DNA sequence, which usually arises as the cell attempts to repair the DNA damage and may have a central role in human carcinogenesis (Ding et al., 2008). Clastogenic effects refers to damage to chromosomes, including DNA breakage, or the rearrangement, gain, or loss of chromosome fragments (Snyder 2010).

113. Further, some carcinogens (e.g., ethylene oxide), which do not require metabolic activation or modification to induce cancer, are called direct-acting or activation-independent carcinogens.

114. Usually, existing as highly reactive electrophilic molecules, direct-acting carcinogens directly interact with and bind to cellular macromolecules, including DNA. Due to this high reactivity, direct-acting carcinogens frequently result in tumour formation at the site of chemical exposure. Such carcinogens and their DNA reactive metabolites are classically considered to represent risk factors at all concentrations since even one or a few DNA lesions, according to the concept of a non-threshold mode of action, which may, in principle, result in mutations and, thus, increase tumour risk (Hartwig et al., 2020).[42]

115. In general, genotoxic carcinogens, especially direct mutagens like EtO, due to their DNA interaction properties, exert their effects even at undetectably low dosages.[43]

---

[42] Hartwig A, Arand M, Epe B, Guth S, Jahnke G, Lampen A, Martus HJ, Monien B, Rietjens IMCM, Schmitz-Spanke S, Schriever-Schwemmer G, Steinberg P, Eisenbrand G. (2020) *Mode of action-based risk assessment of genotoxic carcinogens*. Archives of Toxicology. 94, 1787-1877.

[43] Research suggests EtO has a currently undetectably low minimal dose required for effect ("no-threshold effect"). *See* Aoki Y. (2016) *Possible Determinant of the Threshold for Carcinogenesis*. In: Thresholds of Genotoxic Carcinogens from Mechanisms to Regulation. Eds: Takehiko Nohmi and Shoji Fukushima. Tokyo. Academic Press is an imprint of Elsevier. pp.155-170.

116. The 2022 Safety Data Sheet on EtO by a prominent supplier of the compound, ARC, includes

the following hazard labeling:

HAZARD RATINGS:  (0 = minimum; 4 = maximum)

HMIS Rating:    Health = 3
                    Flammability = 4
                    Reactivity = 3
                    Personal Protection Code = X
                    (Consult your supervisor or standard
                    operating procedures for special
                    handling directions.)

NFPA Rating:    Health = 3
                    Flammability = 4
                    Reactivity = 3



**DISTURBING EMISSIONS DATA: PAST AND PRESENT**

117. Defendants' emission levels rival even the largest industrial facilities and sterilization plants

in the country, and in 2022, the Facility emitted the 12th most EtO of any facility in the US out

of more than 250 tracked facilities. Most of the higher-emitting facilities can be found in rural

areas with appreciably lower populations than Kansas City, making this facility a unique threat

to broader public health.

118. While short of its historic peak, the Facility consistently emitted over 3,400 lbs/year from 2020-22.[44]

119. The Harcros facility uses EtO for its use in "ethoxylation", a chemical process in which ethylene oxide reacts with alcohols, acids, or other substrates to create ethoxylates. These compounds are the building blocks for a wide range of commercial and household products, including detergents, surfactants, emulsifiers, wetting agents, dispersants, and antifoam agents. By design, they lower surface tension and allow oil and water to mix more easily, which makes them highly effective in cleaning products, industrial formulations, and personal care items.

120. The ethoxylation process requires the introduction of large volumes of EtO with other agents.

121. Ethoxylation is, by its very nature, an incomplete reaction. A portion of EtO always remains unreacted. Moreover, when EtO molecules react with one another instead of with the intended feedstock, the process yields 1,4-dioxane. This chemical has long been recognized as a probable human carcinogen—persistent in the environment and hazardous when inhaled or when it contaminates water supplies.

122. The post-processing presence of both unreacted EtO and 1,4-dioxane is neither accidental nor rare. It is an inevitable feature of the process, one that is well-known in the industry. Unless

---

[44]Retrieved and downloaded from

https://enviro.epa.gov/triexplorer/release_fac_profile?TRI=66106HRCRS5200S&TRILIB=TRIQ1&V_NA_INDIC
ATOR=.&FLD=&FLD=RELLBY&FLD=TSFDSP&OFFDISPD=&OTHDISPD=&ONDISPD=&OTHOFFD=&YE
AR=2021

captured and destroyed using advanced emission-control technology—such as thermal oxidizers, scrubbers, or closed-loop recovery systems—these substances escape into the surrounding air. Once released, they spread into neighboring communities, where residents and families are forced to breathe them.

123. In June 2025, air sampling was conducted immediately outside the Harcros facility. This was done with a summa canister, which is a stainless-steel vacuum vessel designed to collect whole-air samples over a defined period. It does not filter, treat, or alter the air it collects. Instead, it captures an unmodified snapshot of ambient conditions. *See* Exhibit D.

124. The canisters, placed near Harcros' storage and reaction tanks, detected EtO concentrations exceeding 2,000 parts per billion (ppb). These readings represent actual breathing air—not emissions tested at a stack, nor laboratory extrapolations, but the raw air present at ground level in real-time.

125. The disparity between these findings and established health benchmarks is extraordinary. According to the NIH, the threshold ethylene oxide concentration associated with elevated cancer risk = 0.011 ppb. Harcros' outdoor ambient air measured concentrations were more than 180,000 times higher.

126. Such levels cannot be dismissed as negligible. They demonstrate unfiltered concentrations that eclipse health-protective thresholds by orders of magnitude. Unlike stack test data—collected at controlled release points and subject to company reporting—summa canister sampling documents the same air the community breathes each day.

127. Harcros' outdoor ambient air measured concentrations cannot be explained as isolated malfunctions. Concentrations above 2,000 ppb are inconsistent with trivial leaks, and prior months' emissions also far eclipse safety standards.

128. They are the foreseeable outcome of a facility operating ethoxylation units without adequate controls to capture or destroy unused EtO and other carcinogens it uses and produces.

129. The evidence establishes that residents around Harcros are routinely exposed to EtO at concentrations that obliterate accepted health-based standards. This exposure subjects the community to chronic, unreasonable, and life-threatening risks. Harcros' disregard for these hazards underscores the urgent need for judicial intervention and equitable relief.

130. Harcros' conduct is not limited to ordinary negligence. It reflects, at a minimum, systemic recklessness in the face of well-documented dangers. By permitting uncontrolled emissions of EtO and 1,4-dioxane, Harcros has externalized the costs of its operations onto the public—leaving nearby residents to endure heightened cancer risks, diminished air quality, and lasting harm to their health.

131. The Class' exposure to EtO is a foreseeable and avoidable consequence of Defendants' reckless indifference to the health, safety, and well-being of those in this community.

**ENVIRONMENTAL (IN)JUSTICE**

132. Despite knowing the risks, Defendants have used and emitted grossly unsafe quantities of EtO and other toxic chemicals, directly causing harm to the Named Plaintiff and class

members.[45] This reckless conduct has significantly harmed the health and well-being of the surrounding community, with Defendants' actions being a proximate cause of the injuries sustained by those affected. This case is not simply about toxic exposure—it reflects systemic environmental injustice, where historically marginalized communities have been disproportionately burdened with the consequences of corporate greed.

133. Defendants have prioritized profits over people for over half a century, knowingly subjecting vulnerable residents to hazardous emissions with devastating health consequences.

134. This Class is made up of communities that are largely Black and Hispanic, predominantly living below the poverty line, with educational attainment levels below the state median. Contextualized further with the historic racially discriminatory redlining policies of the county and Kansas City, Missouri, throughout much of the 20th century, this matter is also a prime case study in systemic environmental injustice.

135. In 2016, researchers from The Ohio State University published a report on the poor state of public health and environmental justice concerns in Wyandotte County.[46] It found, among other things:

---

[45] TRI reporting for the over 30-indexed toxins since 1988 are available at the link in footnote 19, and that list of chemicals is incorporated by reference herein—for the purposes of judicial economy, and in defining "other toxic chemicals" referenced throughout the complaint. Other chemicals, particularly those predating 1988, are referenced throughout the Party section by Defendant Group.

[46] *See,* Health Equity Action Transformation (H.E.A.T.) Report, Health Equity Action Transformation: A Community Health Assessment of Wyandotte County, Kansas (2016), https://wearewyandotte.com/wp-content/uploads/2016/12/CHC_HeatReport_1130.pdf. (last accessed Mar. 4, 2025).

a. According to the annual County Health Rankings published by the Robert Woods Foundation, Wyandotte County, Kansas, consistently ranks last among the state's 105 counties for social determinants of health.

b. Historical maps and documents of the impacted area demonstrate long-term neighborhood disinvestment rooted in discriminatory housing policy, spanning decades. Unsurprisingly, these historically divested neighborhoods are the same areas that experience the worst health outcomes today.

c. Relevant data of clustered areas characterized by high rates of heart disease and cancer point to cumulative stressors beyond genetics and personal choice as detriments to good health and long life. Strikingly, **the average life expectancy in the area surrounding the facility is 20 years lower than the average life expectancy in Kansas**.

d. Depressed housing stock is also located in proximity to areas near the Kansas and Missouri Rivers, where Defendants' facility is located, presenting health risks due to potential toxic exposures. Two of the Census Tracts closest to this area have the highest cancer death rates in Wyandotte County, which, itself, has among the worst cancer rates for the forms of cancer relevant to this matter in Kansas and the US.

136. Relevant literature on environmental justice has developed in the last 30+ years and its insights have become more readily known, including findings which add necessary context to this matter and why this aggregate litigation must be brought:

a. In Marianne Lavelle & Marcia Coyle, *Unequal Protection: The Racial Divide in Environmental Law*, Nat'l L.J., Sept 21 1992, the researchers studied the interaction

between race and the EPA's enforcement of environmental laws and regulations. They found that:

    i. Penalties for fractions under hazardous waste laws in sites near white populations were roughly six times higher than penalties at sites with greatest minority populations;

    ii. This disparity in penalties assessed under toxic waste law occurs by race alone rather than class, as the average mentalities based in median income showed little fluctuation between low and high income;

    iii. Enforcement penalties for air/ water/waste pollution in white communities were 46% higher than in minority communities;

    iv. Abandoned hazardous waste sites in primarily minority areas waited 20% longer to be placed on EPA's national priority list under CERCLA than those in white areas;

    v. CERCLA cleanup began 12%- 42% later in primarily minority sites than in white sites across most EPA regions.

b. In Lesley Fleischman and Marcus Franklin, *Fumes Across the Fence-line – The Health Impacts of Air Pollution From Oil and Gas Facilities in African American Communities*, from 2017, the authors explain the staggering facts that black Americans are exposed to 38% more contaminated air and are 75% more likely than white Americans to live in a "fence-line" community, like those impacted in this matter.

c. In Christopher W. Tessum et. al., *Inequity in consumption of goods and services adds a racial-ethnic disparities in air pollution exposure*, 115 Proc. Nat'l Academy of Scis

6001 (2019), researchers discussed the market-trend link between the majority white-population's disproportionately larger purchasing of the exact goods that cause air pollution, uniquely impacting black and Hispanic fence line populations. Put differently, not only are black and Hispanic fence line communities facing the inequitable brunt of American industrial hazardous emissions, but they also do so while enjoying disproportionately less of the spoils of the goods produced by those industries. Neither having their cake nor getting to eat it.

d. In March 2007, the United Church of Christ Justice and Witness Ministries published a 20-year study titled "*Toxic Wastes and Race in Twenty: 1987-2007 Grassroots Struggles to Dismantle Environmental Racism in the United States*" which found that race is an independent predictor of where hazardous wastes are located and is a stronger single-variable predictor than income, education, and other socioeconomic indicators.

137. This pattern is further contextualized by Defendants' histories and origins previously discussed.

## CLASS ACTION ALLEGATIONS

138. The Plaintiff restates and incorporates by reference the allegations in the preceding paragraphs, as though fully set forth herein, in support of the following class action allegations.

139. The Plaintiff seeks to pursue claims for relief per Rule 23(b)(2) of the Federal Rules of Civil Procedure as a representative of individuals proximately caused by the Defendants' actions and omissions regarding emissions of EtO and other toxic chemicals as alleged herein from the first emissions to a final resolution in this matter, as defined more fully below:

All individuals who have resided or attended school (PreK-12 and/or full-time college enrollment) within a 2.5-mile radius of 5200 Speaker Rd, Kansas City, KS 66106, beginning the first date of operation of the Facility [December, 1960], with 1 years or more of exposure, and who have not[47] been diagnosed with any of the following conditions before final resolution in this matter:

1. Breast Cancer;
2. Blood Cancers (including but not limited to leukemia, lymphoma, multiple myeloma);
3. Lung Cancer;
4. Liver Cancer; or
5. Miscarriages/Severe Birth Defects.

140. Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and members of their immediate families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest, and its officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

141. The class vehicle is proper in this matter because (1) the Class is so numerous that joinder of all members is impracticable; (2) there are substantial questions of law or fact common to the Class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the Class; and (4) the representative parties will fairly and adequately protect the interest of the Class.

---

[47] Individuals who meet the prior requirements and have been diagnosed with one or more of the listed injuries are Putative Class Members of the sister suit of this matter, and thus intentionally not covered by this non-overlapping class description.

142. Membership in these classes is so numerous that joinder is impractical. Although the exact number and identities of class members are currently unknown and can only be ascertained through appropriate discovery, Plaintiff estimates and believes the proposed Class has more than 35,000 members.

143. The claims of the Named Plaintiff and other class members are typical of the claims for all the class members, as all members sustained substantially similar unjustified impact by Defendants' practices, as described in the factual allegations above. Typicality is met because Defendants' affected the class members similarly—namely, by unjustly exposing class members to unsafe toxic emissions. To the extent that exposure periods vary substantially across that class, that's an issue of fitting relief within a protocol, not of legal minimal eligibility.

144. The Named Plaintiff will fairly and adequately protect the interests of the class members, who are victims of the Defendants' acts and omissions and has no interest antagonistic to those of the class members.

145. The Named Plaintiff has retained an international plaintiff class action and mass tort law firm, experienced in prosecuting complex civil litigation, which is well-suited to litigate this matter alongside their exceptionally capable local and co-counsel, itself a nationally renowned mass tort firm. [48]

---

[48]*See generally*, https://milberg.com/,  https://krauseandkinsman.com/.

146. Various shared questions of law and fact arise from Defendants' conduct, making this an appropriate case for resolution utilizing a class action. The common issues include, but are not limited to, the following:

  a. What total amount of EtO and other toxic chemicals have been emitted into the community impacted by the Facility since it started operations in December 1960, and with what regularity, and thus the possible exposure amounts for members of the Class;

  b. Whether class members have a right to injunctive or equitable relief;

  c. Whether all Defendants are liable, to what extent they are liable, to fund a court-overseen medical monitoring program, and

  d. Whether class members are entitled to attorney fees.

147. A class action is superior to other available methods for the fair and efficient adjudication of this controversy, given that:

  a. Common questions of law and fact predominate over individual questions that may arise, such that there would be efficiencies in litigating the common issues class-wide instead of on a repetitive, individual basis;

  b. A class action is required for optimal deterrence, optimal compensation, and to limit the court-awarded reasonable legal expenses incurred by class members;

  c. Should the individual class members be required to bring separate actions in full, Courts would be confronted by a multiplicity of encumbering and duplicative lawsuits, thus burdening the fair and just administration of justice. This creates an unreasonable and unnecessary risk of inconsistent rulings and contradictory judgments. In contrast to beginning on a case-by-case basis, in which inconsistent results would magnify the

delay and expense to all parties and the Court system, this class action will present fewer management difficulties while providing unitary adjudication, providing economies of scale, and comprehensive supervision of this intra-district mass tort, in two parts, by a single Court.

148. Defendants' conduct concerning the Named Plaintiff and class members has been uniform. Defendants treated each of the class members comparably—and with comparable disregard. Defendants did not act with individual-victim particularity concerning these allegations but rather a generalized reckless disregard for the health and well-being of the entire impacted community—the entire Class.

## PROPRIETY OF MEDICAL MONITORING

149. The exposed population are demonstrably at elevated epidemiological and physiological risk of cancer and reproductive injuries due to cumulative exposure.

150. The Plaintiff and class members would not have the present and future need to incur the cost of the diagnostic testing to determine the presence of illness, disease, or disease process related to exposure to EtO and other emitted toxins but for the past and ongoing exposure they have suffered through the tortious conduct of Defendants.

151. The proposed medical monitoring program ("the Program" or "Protocol") would consist of:

    a.  Baseline health assessments for all class members;

    b.  Blood testing for biomarkers, including EtO tracers in hemoglobin to track total cumulative exposure levels;

    c.  Periodic cancer screenings (with specific attention to lymphatic and reproductive systems);

    d.   Pulmonary function tests and endocrine evaluations;

    e.   Reproductive health monitoring—discussed more below;

    f.   Health education on early symptom recognition;

    g.   Longitudinal biomarker tracking and aggregate public reporting.

152. The Program will be administered by a court-approved medical oversight panel composed of epidemiologists, oncologists, and environmental public health specialists. Class members will receive direct notices of eligibility and will have access to bilingual case managers who will coordinate transportation, appointments, and follow-up as needed.

153. All data collected under the Program shall be anonymized and aggregated, with quarterly public reporting to local, state, and federal health departments, as well as the Court. Transparency will be the cornerstone of the Program's design.

154. This model aligns with monitoring regimes implemented in other environmental justice cases, including those addressing PFAS, lead, and diesel particulate matter.[49]

155. Monitoring procedures enable the early detection of cancer, the progression of disease processes, the development of biomarker abnormalities, and other early warning signs of illness, disease progression, and disease. For example:

    a.   Monitoring procedures exist to detect Hodgkin's Lymphoma early. Screening and diagnostic tools include physical exams that look for swollen lymph nodes in the neck,

---

[49] *See, e.g.*, http://www.c-8medicalmonitoringprogram.com/docs/med_panel_education_doc.pdf ,

groin, underarms, and swelling in the spleen and liver, blood tests that look for specific markers, and liver function tests.

b.  Monitoring procedures exist to detect non-Hodgkin's lymphoma early. Screening and diagnostic tools include physical exams that look for swollen lymph nodes and swelling in the spleen and liver and blood tests, including a complete blood count.

c.  Monitoring procedures exist to detect multiple myeloma. Screening and diagnostic tools include blood chemistry tests, serum and urine protein electrophoresis, and immunofixation.

d.  Monitoring procedures exist to detect lymphocytic leukemia. Screening and diagnostic tools include a physical exam to check for swollen lymph nodes, spleen, or liver, blood tests for complete blood count with differential, peripheral blood smears, and to detect lymphoblasts.

156. These monitoring procedures differ from those for the unexposed populations because the general population does not receive this testing as a routine matter.

157. Catching cancer early often allows for more treatment options, often at less total expense than later stages. Overall outlook depends on early diagnosis; the sooner a person is checked, the better the outcome will be.

158. The risks posed by Defendants' emissions are not confined to latent cancers. Ethylene oxide is linked to reproductive toxicity, miscarriages, recurrent pregnancy loss, and adverse neonatal outcomes.

159. Decades of occupational and environmental health research establish that women exposed to EtO during pregnancy face sharply elevated risks of miscarriage, recurrent pregnancy loss, preterm birth, and stillbirth.

160. The consequences of such outcomes extend beyond individual families, producing ripple effects throughout entire communities. These include long-term emotional trauma, economic hardship, and heightened demand on local health systems.

161. These findings are a foreseeable result of the DNA-damaging, endocrine-disrupting, and cytotoxic properties of EtO, which impair gametes, disrupt pregnancy, and compromise fetal development.

162. Absent intervention, members of the Class will continue to suffer preventable miscarriages, recurrent pregnancy loss, fertility struggles, congenital anomalies, and neonatal complications.

163. These injuries are devastating in their human cost and impose substantial financial and logistical burdens on families forced to undergo repeated medical treatments, fertility testing, assisted reproductive technologies, and neonatal intensive care.

164. Families in the plume are often those least able to afford the staggering out-of-pocket costs associated with reproductive health issues.

165. Beyond the immediate emotional devastation, these burdens compound the systemic inequities already faced by predominantly minority and low-income communities. The reality is not only one of shortened life expectancy, but also of repeated interruption of the most basic human aspiration: raising healthy children.

166. Further, the Facility's reproductive health-impacting emissions are not limited to EtO. Other hazardous chemicals released by Defendants further heighten the need for comprehensive monitoring.

167. Vanadium pentoxide, for example, was referenced in the recent EPA enforcement actions against Harcros. It is a highly toxic compound, classified as a probable human carcinogen, and exposure is associated with reproductive health impacts.

168. Other known Facility emissions carry well-established links to cancer, reproductive toxicity, and developmental harm. Their synergistic effects with EtO intensify the health burden on residents, as multiple carcinogens and mutagens interact in the same exposed population.

169. Taken together, this mixture of hazardous chemicals underscores the need for a sufficiently broad-scope medical monitoring program to be implemented. More particularly, it must incorporate baseline reproductive health services, prenatal monitoring, and neonatal care to mitigate the unique risks borne by exposed families.

170. Just as with cancer outcomes, these reproductive harms should be managed through a court-supervised medical monitoring program. Equity demands that such a program not unfairly exclude reproductive injuries.

171. Such services are materially different from routine care offered to the general population. They are specifically tailored to detect and mitigate harm that Defendants' emissions have foreseeably caused.

172. The inclusion of reproductive and developmental monitoring ensures that the Program serves its equitable purpose fully. It must prevent not only premature deaths from cancer, but also the

silent tragedies of repeated miscarriages and preventable birth complications that have plagued this community for decades.

**COUNT I – EQUITABLE RELIEF:**
**INJUNCTION TO FUND COURT-SUPERVISED MEDICAL MONITORING**
**PROGRAM FOR CLASS MEMBERS**
**(Against Each Defendant Individually and Collectively)**

173. The Plaintiff incorporates the foregoing allegations in paragraphs 1-172 as though fully set forth herein.

174. The Plaintiff seeks injunctive and equitable relief through a court-supervised medical monitoring program to detect and mitigate future harm associated with exposure to toxic chemicals emitted from the Facility.

175. This count is brought under the emerging legal standard articulated by many states[50], and recognized in equity, which holds that a party is subject to liability for the cost of medical monitoring where: a. The actor exposes individuals to a significantly increased risk of serious future bodily harm; b. The actor acts tortiously and is the factual and legal cause of the need for monitoring; c. A monitoring regime exists that facilitates early detection and intervention; d.

---

[50] *See, e.g.*: California - *Sadler v. PacifiCare of Nev.*, 130 Nev. 990 (Nev. 2014) (discussing and adopting California law); West Virgina - *Letart v. Union Carbide Corporation*, 461 F.Supp.3d 391 (D. WV. 2020); Utah - *Hansen v. Mountain Fuel Supply Co.*, 858 P.2d 970 (Utah, 1993); Missouri - *Meyer ex rel. Coplin v. Fluor Corp.*, 220 S.W.3d 712 (2007); Pennsylvania - *Almond v. Janssen Pharmaceuticals, Inc.,* 337 F.R.D. 90 (D. Pa. 2020); Nevada – *See Sadler* (adopting California and West Virginia approaches); New Jersey - *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717 (D. N.J. 1994); DC - *Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 46 A.L.R.4th 1113 (D.C. Cir. 1984). By Statute: Vermont - 12 V.S.A. § 7202.

The monitoring is materially different from that required in the absence of exposure; and e. The monitoring is reasonably necessary per accepted medical practices.

176. Plaintiff and class members have been exposed to various carcinogens, mutagens, and endocrine disruptors at levels significantly exceeding baseline environmental exposure. These include ethylene oxide ("EtO"), formaldehyde, dioxins, butadiene, and hydrochloric acid.

177. Defendants' actions and omissions—including, but not limited to, failing to reduce emissions, failing to provide warnings, and concealing the extent of risks—constitute wrongful conduct that gives rise to equitable liability.

178. Plaintiff faces a significantly increased risk of chronic diseases, including cancer and irreversible organ damage. This risk is not speculative; it is substantiated by Risk-Screening Environmental Indicators (RSEI) scores, federal health data, and peer-reviewed research.

179. A clearly defined, medically supported monitoring protocol differs fundamentally from general population care. Such protocols have been implemented in similar environmental exposure cases.

180. Establishing a medical monitoring program will allow for early diagnosis and intervention, potentially reducing the severity and costs of future illnesses and giving class members informed autonomy over their health decisions.

181. Equity demands that the Defendants fully fund and implement this program, including all related administrative costs.

182. The Plaintiff further claims that this relief aligns with the principles of Article III standing. The increased risk of serious disease, combined with a scientifically grounded protocol capable of mitigating harm, is adequate to confer standing for injunctive relief.

183. The relief requested by the Plaintiff is focused solely on future health protection; she is  not seeking monetary compensation, making the remedy both narrow and appropriate.

184. The requested relief is not only equitable but also economically efficient. Internalizing externalities is fundamental to properly functioning private enterprises and efficient markets.

185. In this case, Defendants have externalized the costs of their chemical emissions onto the surrounding community, resulting in elevated disease risks, environmental degradation, and reduced life expectancy. These costs are not borne by the polluter but by the exposed public, including schoolchildren, workers, and the elderly. This situation distorts the actual economic costs of Defendants' business practices.

186. A medical monitoring regime serves as a corrective mechanism that shifts the burden of prevention, screening, and risk mitigation back to the party most capable of preventing harm. It acts as a forward-looking remedial structure that allocates costs to the entity whose activities cause harm, thereby incentivizing safer practices and more accurate risk pricing.

187. The alternative to court-supervised medical monitoring is much more costly and inefficient: it leads to unmitigated disease burdens, avoidable chronic illnesses, and eventual litigation when preventable conditions arise. Early intervention through court-imposed monitoring is thus more cost-effective, as it minimizes public harm while aligning corporate risk management incentives.

188. Furthermore, implementing a monitoring fund reduces reliance on future mass tort litigation, conserving judicial resources and public expenditures. It promotes transparency by generating data on health trends in the exposed population, which is critical for science, governance, and informed community decision-making.

189. Defendants have profited significantly from the Facility over 60 years of operation. However, their profits have not reflected the actual costs of their emissions, as the health-related expenses have been shifted to the public. Medical monitoring is justified; it restores balance to a currently distorted risk-benefit equation.

190. No reasonable market system would permit an industrial actor to offload such significant latent harm without remedy. Therefore, the equitable relief sought here is aligned with public health objectives and adheres to the most conservative and empirically validated traditions of economic jurisprudence.

## PRAYER FOR RELIEF

The Plaintiff is entitled to and prays for trial by jury on all issues.

WHEREFORE, the Plaintiff, individually and on behalf of all those similarly situated, prays for the following:

a.    That the Court certify this case as a Class Action under Rule 23 of the Federal Rules of Civil Procedure and designates the Plaintiff as a representative party;

b.    That the Court appoint Plaintiff's undersigned counsel as Interim Class Counsel under Rule 23(g);

c.    That the Court enter an injunction against Defendants for the funding of a court-supervised Medical Monitoring Program for class members;

d.    That the Court grant equitable and injunctive relief as necessary;

e.    That the Court award the Plaintiff and class members reasonable attorneys' fees, litigation costs and expenses incurred in the prosecution of this action; and

f.    That the Court award all such other relief the Court deems proper.


Respectfully submitted by Plaintiff's undersigned counsel.

Date: October 1, 2025

/s/ Robert L. Kinsman
Robert L. Kinsman (KS #26673)
Adam W. Krause (MO #67462)*
Taimi Pabon (PR # 22,823)*
KRAUSE & KINSMAN GROUP, LLC

Page **47** of **49**

93 Francisco Escudero #1002
Dorado, Puerto Rico 00646
P: (816) 760-2700
F: (816) 760-2800
robert@krauseandkinsman.com
adam@krauseandkinsman.com
tpabon@krauseandkinsman.com
www.krauseandkinsman.com
* *pro hac vice forthcoming*

Joanna Orscheln (KS #27766)*
Monet Duke (IL #6305774 )*
KRAUSE & KINSMAN, LLC
4717 Grand Ave., Suite 300
Kansas City, MO 64112
P: (816) 760-2700
F: (816) 760-2800
joanna@krauseandkinsman.com
mduke@krauseandkinsman.com
www.krauseandkinsman.com
* *pro hac vice forthcoming*

and

MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, LLC

Marc D. Grossman*
Luis V. Almeida-Olivieri*
1311 Ponce de León Ave. Suite 600
San Juan, PR 00907
Tel.: 866-252-0878
mgrossman@milberg.com
lalmeida@milberg.com
* *pro hac vice forthcoming*

Melissa K. Sims*
John M. Restaino, Jr.*
800 South Gay Street, Suite 1100
Knoxville, Tennessee 37929
Tel.: 866-252-0878
msims@milberg.com
jrestaino@milberg.com

*pro hac vice forthcoming*

Nevin Wisnoski*
900 West Morgan Street
Raleigh, North Carolina 27603
Tel.: 866-252-0878
nwisnoski@milberg.com
*pro hac vice forthcoming*